[Civ. No. 23183.   Second Dist., Div. Three.   Nov. 17, 1958.]

HENRY SACHS, Respondent, v. ALBERT E. KILLEEN
et al., Appellants.

Arnerich, Del Valle & Sinatra and Richard A. Perkins for Appellants.

S. L. Kurland for Respondent.

PATROSSO, J. pro tem.*—This is an appeal from an order appointing a receiver ex parte and from an order confirming the appointment and continuing it pendente lite. The action is against Albert E. Killeen, Jack R. Killeen, individually, and also as copartners doing business under the name of Killeen and Son Production Engineering Company, and Herbert C. Manuel, a bookkeeper employed by the Killeens. The action is for an accounting and damages for fraud. It was alleged in the complaint that on October 1, 1951, Sachs and Killeen and Son (hereinafter called Killeen), entered into a written agreement whereby the latter undertook to manufacture a device for regulating the speed of electric motors which had been invented by Sachs; the agreement was for an initial five-year term, renewable for a further five years unless terminated by notice. The agreement provided that Sachs was to do all experimental and design work and to market the device, but he was not to contribute any capital or to be charged with any losses from the venture. Killeen agreed to divide the net profits of the enterprise equally with Sachs, to furnish him with quarterly statements, to remit with the statements any sums due him, and to permit him to inspect the books and records pertaining to the project. Net profits were defined

*Assigned by Chairman of Judicial Council.

in the agreement as gross receipts less (a) the actual cost of materials (b) the actual cost of labor performed by persons other than Sachs or the Killeens (c) overhead, including a $600 monthly salary payable to Albert E. Killeen and (d) amortization of tools, dies and other capital expenditures as mutually agreed. Fully amortized capital expenditures were to become the joint property of Sachs and Killeen. The agreement also provided that upon termination, either party might buy out the interest of the other; the interest "shall consist of all undivided profits, all amortized tools, dies and other capital equipment, any mutually owned inventory, patents, goodwill, etc."

It was also alleged in the complaint that defendants formed a conspiracy to defraud Sachs of his rightful share of the profits from the enterprise. Plaintiff alleged that from 1951 through June 30, 1957, he received from Killeen what purported to be correct quarterly statements of the profits and losses from the sale of the speed control device, showing his 50 per cent share of the net profits to be $58,270, of which $5,074 remained unpaid. It was alleged that the statements submitted by Killeen were false and fraudulent, that defendants withheld $121,229 in profits actually earned by plaintiff, and that by charging unauthorized expenses against the gross receipts of the venture, they defrauded Sachs of an additional $80,000. Plaintiff also alleged that he received statements from defendants showing a loss of $1,112 for the first six months of 1957, that defendants have wrongfully withheld the statement for the third quarter of 1957, and that said statement shows a net profit of $43,047 from the manufacture and sale of the speed control device for the first nine months of 1957.

It was further alleged on information and belief that defendants have defrauded Sachs of sums in excess of $201,229, that defendants are insolvent and without funds except for the sums they have wrongfully withheld from plaintiff, and that unless a receiver is appointed, defendants will conceal their property, remove it from the jurisdiction of the court and alter or destroy their records. Plaintiff also alleged on information and belief that all the property owned by the Killeens, to wit: a home, the Killeen factory building and equipment, two automobiles, securities, and cash on deposit in two banks and a savings and loan association, was acquired with money wrongfully withheld from plaintiff and that all such property is held by the Killeens as trustees for Sachs. The

prayer of the complaint was for an accounting of all transactions regarding the manufacture and sale of the speed control device, that a receiver be appointed of the property of defendants, that defendants be restrained from transferring or concealing the properties listed in the complaint, that plaintiff have judgment for $201,229 and any additional sums found to be due him, and for punitive damages in the sum of $100,000.

An affidavit of plaintiff was filed in support of the application for appointment of a receiver, which stated that to his personal knowledge the Killeens were engaged full time in the production of the speed control device and had no other business or source of income, that the balance sheets of the Killeens showed that their net worth did not exceed $5,000 in 1951, and that their assets were acquired almost entirely from the sale of the device. It was alleged that plaintiff had examined the books of Killeen and Son and discovered duplicate sets of records in the handwriting of Manuel, that he had seen reports made by Manuel for submission to the Killeens and compared them with the quarterly statements furnished to him, and that he had found discrepancies in such reports showing an understatement of net income of not less than $121,229. Photostatic copies of two balance sheets allegedly in Manuel's handwriting were attached to the affidavit. One, marked ''H. Sachs Copy,'' was the report submitted to plaintiff for the quarter ending December 31, 1954; it stated the net profits for the year at $40,172. According to the other balance sheet, marked ''A. Killeen Copy'' and allegedly submitted by Manuel to Killeen and Son, the net profit for the year was $60,523. There were numerous discrepancies between the two summaries: i.e., purchases were stated as $75,141 in the Killeen summary and as $77,141 in the Sachs summary; the inventory of raw materials was stated as $15,184 in the Killeen summary and as $6,184 in the Sachs summary; the inventory of work in process was stated as $2,569 in the Killeen summary and as $1,569 in the Sachs summary; the manufacturing expenses indicated in the summary furnished plaintiff exceeded those in the Killeen summary by $998; the selling expenses referred to in the Sachs summary exceeded those in the Killeen summary by $1,000; administrative expenses were stated in the Killeen summary as $3,771 and in the Sachs summary as $10,124. It was alleged that the additional costs and lessened inventory in the Killeen summary totalled $20,351, an amount equal to the difference between

the net profits as stated in the summary furnished to plaintiff and the summary prepared by Manuel for the Killeens. Upon this showing a receiver was appointed ex parte.

Defendants filed an answer to the complaint. The Killeens admitted the execution of the contract and admitted owing $5,074 to Sachs. Defendants denied having defrauded plaintiff and denied rendering him any false statements. They alleged that their quarterly statements were correct "except for adjustments made at plaintiff's request" and that the system of accounting under the contract was "modified in certain particulars from time to time by executed oral agreements whereby plaintiff consented and agreed to accept performance differing in certain respects from that specified in the written agreement, waived any right to demand performance strictly in accordance with the terms of said written agreement and became, was and is estopped to deny such oral modifications. . . ." The Killeens denied that any of their assets were acquired with funds wrongfully withheld from Sachs; they alleged that they owned property consisting of $40,500 on deposit in banks and a savings and loan association, securities worth $5,500, real property of a value of $85,000 over and above encumbrances, and two automobiles worth $2,200. The answer contains a counterclaim for $60,000 damages allegedly sustained by reason of plaintiff's surreptitious removal of personal property and business records from the business offices of Killeen.

Three affidavits in opposition to confirmation of the appointment of a receiver were filed on behalf of defendants. The affidavit of Albert E. Killeen stated that Killeen and Son has been engaged in manufacturing tools, dies and metal products since 1942 and that a receivership would cause irreparable damage to the business. Killeen denied that Sachs invented the speed control device, alleging that it was merely an improvement upon a device owned by Utility Appliance Corporation, Sachs' employer. It was also alleged that Sachs failed to perform his obligations under the 1951 agreement in that he did not do the experimental and design work and that he did not handle the sales and marketing of the device as his employer forbade him to engage in selling activities on behalf of any other company. It was also alleged that Killeen and Son kept a separate set of books in connection with the speed control project for the reason that the company continued to operate its other business, as plaintiff well knew. Killeen denied that Manuel had prepared a report showing

that the net profits of the project for the first nine months of 1957 were $43,047; he alleged that the report listed the partnership's share of profits from the project together with profits from its other business. It was also alleged that the discrepancies mentioned in the affidavit of Sachs were due to the latter's comparing the 1954 reports applicable to the speed control venture with reports applicable to the total business of the company. It was further alleged that the understatement of net profits in the "H. Sachs Copy" for 1954 was due to plaintiff's wish to have $10,000 in profits deferred until 1955 for tax purposes, whereupon Manuel prepared a report at Sachs' request showing Sachs' share of the profits to be only $20,000. It was also alleged that 11 per cent of the gross sales of Killeen and Son are derived from sources other than the speed control project. Manuel filed an affidavit which corroborated Killeen's statements regarding preparation of the 1954 summary. Manuel alleged that the $10,000 was credited to Sachs in 1955. An affidavit by one Mirabal, an accountant, stated that he had made an examination of the records of Killeen and Son and had found but one set of books. He also corroborated Killeen's statement about the deferring of credit on the 1954 profits.

At the hearing for confirmation of the appointment, reply affidavits were filed by plaintiff, plaintiff's attorney, and one Alford, a certified public accountant. The affidavit of Sachs stated that the written agreement was never modified by the parties, that he did not request deferment of any profits earned in 1954 until the following year, and that he did the experimental and design work for the speed control device and procured most of the sales. It was alleged in the affidavit of the attorney that he had taken the depositions of Manuel and Albert E. Killeen. (The depositions had not been signed on the hearing date and were marked for identification only.) Manuel assertedly testified in his deposition that he had been working in his spare time as the Killeens' bookkeeper since 1942, that he received as much as $2,750 a year from the Killeens but did not report this compensation in his income tax returns, that he prepared the quarterly statements furnished to Sachs from information provided by Albert E. Killeen, that Killeen told him to add fictitious items of expense to those legitimately incurred, and that these fictitious items consisted of expenditures relating to purchases, administration, manufacturing and sales. Killeen assertedly testified in his deposi-

tion that he kept a record of the fictitious charges on "scratch sheets" which he no longer had in his possession.

Alford stated in his affidavit that he had examined the books and records of Killeen and Son, including copies of the company's tax returns, profit and loss statements and balance sheets. He alleged that none of the reports submitted to Sachs agreed with the books of the company, that costs and expenses were charged to the venture without any support in the records, and that from 96 per cent to 99.9 per cent of the company's expenses were attributed to the venture. Alford also alleged that the amount wrongfully withheld from Sachs exceeded $174,000. His affidavit gave a detailed statement of discrepancies between the sales and net profits reported to Sachs from 1951 to 1957 and those reflected in the books of the company: e.g., in 1955 the company reported in its federal income tax return a net profit of $117,466 upon sales of $319,644, whereas it reported to plaintiff a net profit of $39,301 on sales totalling $308,833; in 1956 the company reported to the tax authorities a net profit of $66,260 upon sales totalling $248,352, while it reported to Sachs a net profit of $20,473 upon sales of $244,193. Alford also stated that a profit and loss statement prepared by Manuel for the first 10 months of 1957 reflected sales of $101,682 and a profit of $44,824, while the report submitted to plaintiff for the identical period reflected sales of $91,863 and a net loss of $6,187. Three charts prepared by Alford from the records of Killeen and Son were attached to his affidavit as exhibits. The charts showed that the Killeens had reported $112,578 in profits upon gross receipts of $1,013,707 in their quarterly statements to plaintiff from 1951 to 1957, and that Sachs' actual share of the profits was not $56,288, as represented to him by the Killeens, but $185,453.

The ex parte order appointing a receiver, and which was later confirmed, authorized the receiver to take, care for and keep possession of all property of the Killeens, as described in the complaint, namely, their real property, their automobiles, bank accounts and securities and to manage their business.

We think that upon the showing made by plaintiff the court was warranted in confirming the appointment of a receiver of the property of the Killeens.

Section 564, subdivision 1 of the Code of Civil Procedure authorizes the court to appoint a receiver "[I]n an action by a vendor to vacate a fraudulent purchase of property, or by a creditor to subject any property or fund to his claim, *or*

*between partners or others jointly owning or interested in any property or fund, on the application of the plaintiff, or of any party whose right to or interest in the property or fund, or the proceeds thereof, is probable, and where it is shown that the property or fund is in danger of being lost, removed, or materially injured."* (Emphasis added.)

The appointment of a receiver pendente lite is a matter for the sound discretion of the trial court. (42 Cal.Jur.2d 341.) Where there is evidence that the plaintiff has at least a probable right or interest in the property sought to be placed in receivership and that the property is in danger of destruction, removal or misappropriation, the appointment of a receiver will not be disturbed on appeal. *Armbrust* v. *Armbrust*, 75 Cal.App.2d 272, 275 [171 P.2d 75], and cases cited; *Republic of China* v. *Chang*, 134 Cal.App.2d 124, 131 [285 P.2d 351].)

Appellants contend that there was no evidence that plaintiff had an interest in the property placed under receivership. The argument is without merit. The verified complaint and the affidavits submitted by plaintiff furnished ample evidentiary support for a conclusion that Sachs had at least a probable interest in the described property. Appellants urge that the written agreement created neither a partnership nor a joint venture, hence Sachs is in the position of an unsecured creditor suing at law to recover a debt. The action is not one of law, but is essentially an equitable action to obtain an accounting and establish a constructive trust. Furthermore, it is immaterial whether the 1951 agreement created either a partnership or a joint venture. Under the agreement Sachs was to receive 50 per cent of the net profits from the sale of the speed control device. It cannot be doubted that he had an interest in the net profits. The court could properly infer from the facts alleged in the affidavits of Sachs and Alford that the Killeens were systematically falsifying their quarterly statements and diverting to their own use the net profits which belonged to Sachs. It was likewise a reasonable inference, if not a necessary one, from the showing made by plaintiff, that the property of the Killeens was acquired in large part with the funds withheld from plaintiff. Appellants admitted having assets worth $147,000; there was evidence that they had assets valued at only $5,000 in 1951. The court could also consider the accountant's computations that the profits withheld from Sachs were approximately $129,000. In view of the statement in

Killeen's affidavit that only 11 per cent of the company's business derived from sources other than the speed control device, the court could well disbelieve his assertions that appellants' property was acquired otherwise than from the profits of the venture. Killeen's denials created merely a conflict in the evidence, which was resolved against appellants by the court. (*Fox* v. *Flood*, 44 Cal.App. 786 [187 P. 68]; *Davies* v. *Ramsdell*, 40 Cal.App. 432 [183 P. 702].)

Appellants argue that the statements of the accountant as to the contents of their business records were inadmissible hearsay and furnished no basis for the appointment of a receiver. The argument is unsound. Under Code of Civil Procedure, section 1855, subdivision 5, secondary evidence of the contents of a writing may be received where the writing consists of numerous accounts or other documents which cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole. In such case the results of an examination made by a qualified person of such books and documents may be proved by his testimony. (*San Pedro Lumber Co.* v. *Reynolds*, 121 Cal. 74, 86 [53 P. 410]; *McPherson* v. *Great Western Milling Co.*, 44 Cal.App. 491, 495 [186 P. 803].) The summary and charts prepared by Alford were properly considered by the court.

It is next contended that plaintiff made no showing that the property put in receivership was in danger of loss, removal or material injury. The argument cannot be maintained. The court could reasonably conclude from the evidence of continuous misappropriation and diversion of speed control profits into the assets held by the Killeens in their own names, and from their concealment of the actual profits of the business, that those assets were in danger of being lost to Sachs and placed beyond his reach. This was a sufficient showing to justify the appointment of a receiver pendente lite (*Moore* v. *Oberg*, 61 Cal.App.2d 216, 219-220 [142 P.2d 443].)

Another contention of appellants is that the plenary receivership imposed upon them violated due process of law because it deprived them of the means of defending the action. If, however, as we have held, the trial court was warranted in making the order confirming the appointment of the receiver it is of no consequence that its effect may have been to deprive the appellants of the right to use funds, to which it appeared probable that plaintiff was entitled, for the purpose

of defending the action. Incidentally it may be noted that pursuant to a stipulation of the parties, the court subsequently made an order directing the receiver to release $10,000 to appellants for the purpose of defending the action.

█ A final contention of appellants is that the ex parte order exceeded the jurisdiction of the court in that it contained a preliminary injunction without providing that Sachs file a written undertaking, as required by section 529 of the Code of Civil Procedure.[1] We are not persuaded by the argument. The ex parte order provided, *inter alia,* that "all persons at interest or with interest in the . . . [Killeens] . . . or their business or property . . ." are enjoined from "interfering with, transferring, selling or disposing" of any property or income of the Killeens, individually and as copartners, and "from taking possession, or of levying upon or attempting to" sell or dispose of such property. The property had been ordered into the possession of the receiver. So far as appellants are concerned the so-called injunction was no more than a restraint of appellants from defeating the receiver's possession and this would have been implied from other provisions of the order. The order of confirmation reads as follows: "The ex parte appointment of receiver is confirmed"; it did not purport to confirm the provision we have just quoted. Furthermore, even if that provision were void, its invalidity would not render invalid the appointment of a receiver.

█ The ex parte order appointing a receiver is not appealable and the purported appeal therefrom is dismissed. The order confirming the appointment of a receiver is affirmed.

Shinn, P. J., and Vallée, J., concurred.

---

[1] A $2,000 bond has been given by plaintiff for appellants' indemnification on the ex parte appointment. The receiver had given a faithful performance bond of $100,000.